UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Hansa Meyer Transport ) <br> GMBH & Co., KG, ) <br> ) <br>       Plaintiff, ) <br>   vs. ) <br> ) <br> Norfolk Southern Railway ) <br> Company, ) <br>       Defendant. ) <br> _____) | Civil Action No.: 6:06-0924-RBH <br><br> **ORDER** |

This action arises from the derailment on March 23, 2004 of a train operated by the defendant which was transporting a transformer from Portsmouth, Virginia to Anderson, South Carolina. As a result of the derailment near Greenville, South Carolina, the transformer was allegedly a complete loss.

Defendant moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on the basis that there is no genuine issue as to any material fact and that defendant is entitled to judgment as a matter of law. The grounds for the motion are that (1) to the extent that Plaintiff attempts to assert state law causes of action, the state law claims are preempted by the Carmack Amendment, 49 U.S.C. § 11706; (2) to the extent that Plaintiff attempts to assert causes of action based on federal common law, they are preempted by the Carmack Amendment; (3) Norfolk Southern should be granted summary judgment on the Carmack Amendment claim because Plaintiff lacks standing and cannot prove that it suffered actual loss or injuries; and (4) if the Court finds there are disputed issues of fact regarding standing and actual injuries by the plaintiff, the undisputed evidence establishes that a $100,000 limitation of liability exists as to those injuries.

1

## LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the moving party makes the showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

When no genuine issue of any material fact exists, summary judgment is appropriate. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Id*. However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id*., *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In this case, the defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." *Temkin v. Frederick County Commrs*, 945 F.2d 716, 718 (4th Cir. 1991) (*citing Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986)). If the defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." *Id*. at 718-19 (*citing Anderson*, 477 U.S. at 247-48).

Moreover, "once the moving party has met its burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992). The nonmoving party may not rely on beliefs, conjecture, speculation, of conclusory allegations to defeat a motion for summary judgment. *Id*. and *Doyle v. Sentry, Insurance Inc.*, 877 F. Supp. 1002, 1005

(E.D. Va 1995). Rather, the nonmoving party is required to submit evidence of specific facts by way of affidavits (*see* Fed. R. Civ. P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. *Baber*, 977 F.2d 872, *citing Celotex Corp.*, *supra*.

Summary judgment should only be granted in those cases where there is no issue of fact involved and inquiry into the facts is not necessary to clarify application of the law. *McKinney v. Board of Trustees Mayland Community College*, 955 F.2d 924 (4th Cir. 1992). A district court should not grant summary judgment "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under the circumstances." *Campbell v. Hewitt, Coleman & Assoc.*, 21 F.3d 52, 55 (4th Cir. 1994).

**FACTS**

The transformer which is the subject of this action was manufactured by an Austrian company, VA Tech, and had been transported from Austria to Belgium. VA Tech contracted with plaintiff Hansa Meyer Transport GMBH & Co., KG ("Hansa Meyer"), a German freight forwarder, to arrange shipment of the transformer to its customer, Duke Energy in the United States. Hansa Meyer arranged for the ocean transport of the transformer from Belgium to the United States. Hansa Meyer then contracted with Alliance International Forwarders ("Allliance"), a freight-forwarder based in Houston, Texas to assist with the land transportation within the United States of the transformer. Alliance sub-contracted with Land Transportation, which in turn worked through its agent, TransLink, Inc. TransLink negotiated the terms of a Bill of Lading with defendant, Norfolk Southern, for domestic rail transportation of the transformer from Portsmouth, Virginia, the ocean port of discharge, to Anderson, South Carolina, the job site.

Mike Scott, whose employment with TransLink has since been terminated, was serving as

general manager of TransLink and requested rates from Norfolk Southern for the load. The record contains several e-mails between Scott and employees of the defendant regarding the matter. By e-mail dated December 26, 2003 and follow-up e-mail dated January 12, 2004, Scott requested pricing from the defendant for the shipment of the transformer. On January 15, 2004, Balbach Brooke, product manager for the defendant, forwarded an e-mail "rate offer" to Scott as follows: "Listed below OFFERS include the .25 reduction on the rates we discussed. Please advise if these rates will move the traffic and I will publish to protect. . . Portsmouth to Anderson, SC-HW-443850-3 (537 miles) $4.83 cwt 250,000 lbs m/w."

Scott sent the rate quote to Mario Cassier of Alliance. (Scott Depo., Exhibit 5) The rate quote was dated November 11, 2003 and updated on January 21, 2004. The quote contained a notation that cargo liability limits were $100,000. Scott was asked by counsel for Norfolk Southern whether Cassier ever requested him to obtain a "full value quote" for the transportation of the subject transformer. In response, he stated, "I'd have to go back through my notes to see for sure if he did request it but I don't recall." (Depo., p. 22).

> Q. (By Mr. Cohen) Okay. Do you have your notes there?
> A. Well, just what you've sent me.
> Q. Do you have anything else that would refresh-let me ask you this: If he had requested a full liability rate, would you have quoted him a full liability rate?
> Mr. Bluestein: Object to the form but you can answer.
> A. Yes.

(Depo., p. 22-23).

On cross-examination, Scott testified:

> Q. Why did you leave TransLink?
> A. Well, they let me go. They said my contract was fulfilled and my services were no longer needed.
> Q. With regards to any conversations you had with Norfolk Southern, at any time did Norfolk Southern ever give you a rate for full liability?
> A. For this shipment, no. . .
> Q. And when you say full liability rate, that means that Norfolk Southern would be

4

>liable for the full value of this cargo?
>A. That is correct.
>Q. At any time did Norfolk Southern ever provide you with a document where you could insert the value of the transformer and ask for a full liability rate?
>A. No. . .
>Q. Did you ever receive a bill of lading from Norfolk Southern that had a place on it for you to insert the full value of this transformer?
>A. No.

(Depo., pp. 36-37).

By e-mail dated January 19, 2004 (from Scott to Brooke and Tim Mann of Norfolk Southern), Scott indicated that "we got the job... Please publish rates to include each of the destinations and pricing listed below (apparently referring to the January 15 offer)." On January 22, 2004, Brooke states: "Emailed you copy of NSRQ 63768 to protect movements via NS DIRECT. . . Has the movement been cleared?" Also on January 22, 2004, Scott e-mailed Brooke that the clearances were done in November and that he "got the quote." The record also contains an e-mail from a Norfolk Southern address to Scott dated January 21, 2004 forwarding NSRQ 63768, referencing the Anderson, South Carolina shipment at a price of $4.83 per cwt, with Note Reference 01. Note Reference 01 refers, *inter alia*, to the following: "Shipments tendered under rates published herein are restricted to carrier liability not to exceed $100,000 per shipment." The NSRQ 63768 rate authority also states that it is "subject to the rules and regulations published in Norfolk Southern Railway Conditions of Carriage, #1-D, and any supplements or reissues thereof." The e-mail indicates that the rate authority was sent to Scott and to Traci Young of TransLink.

The "NS Conditions of Carriage #1-E" is attached as Exhibit "D" to the Plaintiff's Memorandum in Opposition to Motion for Summary Judgment. This version of the "Conditions of Contract" states that it was effective June 1, 2003 and that it "Cancels NS Conditions of Carriage #1-D", which was referenced in the rate quote issued by Norfolk Southern. A review of the

5

"Conditions of Contract" reveals there is no provision contained therein which references or offers alternative limitation of liability terms to the shipper.

Under the NS Conditions of Carriage #1-E, "Shipper" is defined as "the party that enters into the contract of carriage with NS or the originating rail carrier." See Plaintiff's Exhibit D, page 3, Rule 100 - Definitions. It further states "The Shipper may be acting on its own behalf or on the behalf of another party....the Shipper might or might not be the owner of the lading...The Shipper may file a claim with NS for loss or damage to lading under Rule 290 below." *Id*. Under section (1)(b), it provides, "A claim may be filed by either the Shipper or the Consignee. Any other party who desires to file a claim with NS must secure first an assignment of claim from the Shipper or the Consignee." *Id*., at page 8. Under section (1)(e) the conditions provide "NS's liability will not extend beyond the actual physical loss or damage to the cargo itself, including any costs reasonably incurred in efforts to mitigate the loss or damage." *Id*., at page 9.

Under Rule 200 that is entitled "Transportation Services", the NS Conditions of Carriage provide:

(1) Shipper will notify NS when loading of equipment is completed and ready for movement or when loaded equipment is made empty and ready for release to NS. Unless otherwise mutually agreed upon by Shipper and NS, Shipper shall prepare and both parties shall execute the transportation documents to cover the line haul transportation service requested by Shipper. Shipper shall provide instructions for the transportation services requested for the shipment. NS will arrange for transportation and delivery in accordance with instructions shown on the bill of lading, which instructions shall be governed by these Conditions of Carriage.

Under Rule 290, entitled "Loss of and Damage to Shipments", the Conditions provide, under section (1)(a), "Unless modified in a transportation contract or a general or customer specific rate quotation, NS will assume liability for loss and damage under the terms of 49 U.S.C. § 11706 and the terms of the Uniform bill of Lading as specified in Rule 150 herein." *Id.*, at page 8.

TransLink subsequently issued a "Bill of Lading" covering the rail carriage in question

(Exhibit 7 to Scott deposition). Scott testified that TransLink prepared the bill of lading and provided it to Norfolk Southern. (Scott Depo., page 27.) The bill of lading included a declaration of value for the transformer of $1,712,440.00, which Mr. Scott testified that he inserted on the bill of lading to alert Norfolk Southern that this was a "high value load." (Scott Depo,, p. 49.) Scott considered this shipment to be a high value load because it was "over a million dollars in value." *Id.* Scott testified that Norfolk Southern charged a "Heavy Duty Use" charge, which was a charge for the use of a heavy duty railcar and to have the railroad pre-clear the shipment. (Scott Depo., p. 46).

The Bill of Lading referenced NS Rate Authority NSRQ63768 and states: "HIGH VALUE LOAD\*\*\*HIGH/WIDE EXTREME DIMENSIONS\*\*\*DO NOT HUMP\*\*\*DO NOT HUMP\*\*\*DO NOT HUMP\*\*\*SHOVE TO REST AT LOW SPEED\*\*RAILCAR'S "B" END MUST ENTER DELIVERY SITE FIRST FOR SPOTTING".  The Bill of Lading was signed by Traci L. Young on behalf of TransLink.  It also indicates that TransLink is an agent for Land Transportation and that the freight bill should be sent to Land Transportation.

On or about March 23, 2004, TransLink was notified that the subject freight had derailed at the Norfolk Southern Greenville yard and, by written letter of claim dated March 24, 2004, TransLink, on behalf of Alliance, placed Norfolk Southern on notice that the railroad was being held liable for all damage that occurred because of the derailment. (Scott Depo., p. 25 and Exhibit 16.) Scott signed the claim dated December 22, 2004 on behalf of TransLink for the full value, although he testified at his deposition that he understood the limit of liability to be $100,000. Scott Deposition Exhibit 17.)[1]

---

[1] Defendant submitted an affidavit by Michael Scott in support of its motion for summary judgment.  Plaintiff objects to the affidavit on grounds that it was signed on the date of the first deposition of Scott which was quashed and it was not supplied to it during discovery or before Scott was re-deposed pursuant to this Court's Order. Defendant has attached to its filings documentation that

Scott sent an e-mail to Mario Cassier with Alliance after the derailment inquiring as to whether additional insurance was obtained by Alliance or its customer over and above the limited liability of the railroad and Cassier responded that that they did not obtain such insurance. (Exhibit 8).

Subsequently, Translink prepared and executed an Assignment of Claim and Agreement, whereby Translink assigned to Hansa Meyer the right to claim directly against Norfolk Southern for the subject loss pursuant to the Contract of Carriage between Translink and Norfolk Southern. (Scott Depo., p. 63 and Exhibits 19 and 20).

Plaintiff alleges that the cargo owner, VA Tech, made a claim against Hansa Meyer for the damage caused to the subject transformer as a result of the derailment. *See* Huter Deposition, pages 123-124, 170; Affidavit of Dierk Armin Nickelsen, attached as Plaintiff's Exhibit "F". Plaintiff also asserts that VA Tech made a claim against their all risk cargo insurance underwriter, National Versicherung, for the total loss of the transformer in question, which was paid by National Versicherung to VA Tech. *See* Dunkl Deposition, at page 68. National Versicherung, through their recovery agents, International Cargo and Transport Services Company, subsequently asserted a subrogation claim for the amount it paid for the total loss of the transformer against the Plaintiff, Hansa Meyer. *See* Huter Deposition, at pages 172-173.

### *LEGAL ANALYSIS*

#### *A. PREEMPTION OF STATE AND FEDERAL COMMON LAW CLAIMS*

Defendant asserts that any state or federal common law claims which the plaintiff attempts

---

Plaintiff's counsel obtained a copy of the first deposition and that it contained similar content to the affidavit. The Court finds that the content of the second deposition of Scott is also similar to the affidavit and finds no prejudice to Plaintiff. Therefore, the affidavit will be considered.

to bring in its Complaint are preempted by the Carmack Amendment. Plaintiff does not appear to contest this in its filings with this Court. The Fourth Circuit has held that "the Carmack Amendment was intended by Congress to create a national uniform policy regarding the liability of carriers under a bill of lading for goods lost or damaged in shipment. Allowing a shipper to bring common law breach of contract or negligence claims against a carrier for such loss or damage conflicts with this policy." *Shao v. Link Cargo (Taiwan) Limited*, 986 F.2d 700, 706 (4th Cir. 1993). *See also*, *Adams Express Co. v. Croninger*, 226 U.S. 491, 505-6 (1913). Therefore, the defendant's motion for summary judgment is granted as to Plaintiff's state common law claims.[2] Defendant also contends and the plaintiff does not refute that the Carmack Amendment preempts all federal common law claims. Most courts have held that the Carmack Amendment preempts federal common law claims on the basis that it "essentially adopts the common law of carriers"[3] and on the basis of the broad scope of the Carmack Amendment. "Almost every detail is covered so completely [by the Carmack Amendment] that there can be no rational doubt that Congress intended to take possession of the subject and supercede all state regulation with reference to it." *Adams Express*, 226 U.S. at 505. Therefore, the Court also grants the defendant's motion for summary judgment as to any federal common law claims.[4]

---

[2] Plaintiff's Complaint contains two causes of action. The first cause of action is for breach of contract and the second cause of action is for indemnification. The only named defendant is Norfolk Southern.

[3] *Ward v. Allied Van Lines, Inc.*, 231 F.3d 135, 139 (4th Cir. 2000).

[4] Neither party in this case has taken the position that the federal maritime law applies, although the equipment was shipped from overseas. The Court assumes that the reason for this is that a "through bill of lading, in which cargo owners can contract for transportation across oceans and to land destinations in a single transaction" was not utilized but rather a separate bill of lading covered only the land shipment. *See Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 25-26 (2004).

9

## *2. STANDING AND ACTUAL LOSS SUFFERED BY THE PLAINTIFF*

Defendant contends that plaintiff Hansa Meyer lacks standing to bring this action under the Carmack Amendment because neither it nor its assignor, TransLink, had the right to recover the transformer under the bill of lading. It contends that VA Tech was the owner of the transformer and that Land Transportation was the shipper and that neither of these companies assigned their interest to Hansa Meyer. It asserts that TransLink was merely an agent for a disclosed principal, Land Transportation and that Land Transportation did not assign its interest or actually suffer any damage.[5]

Plaintiff contends, on the other hand, that the bill of lading lists TransLink as the "shipper" and that, as such, it had the right to recover the shipment. Plaintiff points to the letter sent by defendant to TransLink regarding the loss (Scott Depo., Exhibit 9) which offers to pay $100,000 "in full settlement of your claim" and arguably appears to recognize that TransLink was a proper party to make the claim. Plaintiff contends that, since TransLink assigned "all title, interest and rights which it has or may have in any claim or claims against each and every transportation company for the recovery of money or for other redress on account of loss, damage and injury to against the shipment which consisted of (the transformer)", Hansa Meyer has standing to bring this action.

The Court finds that summary judgment on the issue of standing is not appropriate. Under the Carmack Amendment, the "rail carrier. . . (is) liable to the person entitled to recover under the receipt or bill of lading." 49 U.S.C. § 11706(a). *See also*, *Pennsylvania R. Co. v. Olivit Bros.*, 243 U.S. 574 (1917) (construing prior statutory language concerning "lawful holder" of bill of lading). The bill of lading in the case at bar lists TransLink as the shipper. The Norfolk Southern

---

[5] Defendants have never made a motion pursuant to Fed. R. Civ. P. 17 or 19 to join Land Transportation as a party to this lawsuit.

Conditions of Carriage referenced above specifically state that a shipper or its assignee may file a claim for damages.[6] In addition, plaintiff presents evidence that shows Hansa Meyer is possibly subject to liability regarding the matter due to a payment by a insurance company with a subrogation claim. The Court is furthermore not convinced that the fact TransLink may have acted for a disclosed principal, Land Transportation, is definitive on this issue.[7] The motion for summary judgment is denied as to the standing of the plaintiff to bring this action.

### 3. LIMITATION OF LIABILITY

The Carmack Amendment to the Interstate Commerce Act, as applied to rail carriers, imposes absolute liability upon carriers for "the actual loss or injury to property caused by" a carrier. 49 U.S.C. § 11706 provides in pertinent part:

**§ 11706. Liability of rail carriers under receipts and bills of lading**
(a) A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part shall issue a receipt or bill of lading for property it receives for transportation under this part. That rail carrier and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Board under this part are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this subsection is for the actual loss or injury to the property caused by--
(1) the receiving rail carrier;
(2) the delivering rail carrier; or
(3) another rail carrier over whose line or route the property is transported in the

---

[6] "Shipper" is defined in the Conditions of Carriage as "the party that enters into the contract of carriage with NS or the originating rail carrier." "The Shipper may be acting on its own behalf or on the behalf of another party...The Shipper may file a claim with NS for loss or damage to lading. . . ." "A claim may be filed by either the Shipper or the Consignee. Any other party who desires to file a claim with NS must secure first an assignment of claim from the Shipper or the Consignee." *Id*., at page 8.

[7] *See Kirby*, 543 U.S. at 34 ("We think reliance on agency law is misplaced here. . . In holding that an intermediary binds a cargo owner to the liability limitations it negotiates with downstream carriers, we do not infringe on traditional agency principles.") The motion for summary judgment is denied as to the standing of the plaintiff to bring this action.

United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading.
...
(c)(c) (1) A rail carrier may not limit or be exempt from liability imposed under subsection (a) of this section except as provided in this subsection. A limitation of liability or of the amount of recovery or representation or agreement in a receipt, bill of lading, contract, or rule in violation of this section is void.
(3) A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part may establish rates for transportation of property under which--
(A) the liability of the rail carrier for such property is limited to a value established by written declaration of the shipper or by a written agreement between the shipper and the carrier; or
(B) specified amounts are deducted, pursuant to a written agreement between the shipper and the carrier, from any claim against the carrier with respect to the transportation of such property.

Plaintiff asserts that case law has established four requirements that must be met by a carrier before it may effectively limit its liability: "(1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission; (2) obtain the shipper's agreement as to his choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to moving the shipment." *See Bio-Lab, Inc. v. Pony Express Courier Corp.*, 911 F.2d 1580, 1582 ($11_{th}$ Cir. 1990). In the instant case, Plaintiff asserts that conditions (2) and (3) were not met by the carrier, which require that the rail carrier demonstrate the shipper had a reasonable opportunity to choose between different levels of coverage expressly stated in the contract of carriage, meaning "the shipper had both reasonable notice of the liability limitation and the opportunity to obtain information necessary to make a deliberate and well-informed choice." *Id.*, quoting *Huges v. United Van Lines*, 829 F.2d 1407, 1419 ($7_{th}$ Cir. 1987). Plaintiff contends that a shipper must be shown to have made an "absolute, deliberate and well-informed choice" to limit the carrier's liability prior to shipping the goods, citing *Carmana Designs Ltd. v. North American Van Lines, Inc.*, 943 F.2d 316, 321 (3rd Cir. 1991).

Defendant contends that case law does not require "magic words" to be used by a carrier and that the undisputed facts show that TransLink agreed to the $100,000 limitation of liability.

By way of background, the Carmack Amendment was enacted in 1906 as part of the Interstate Commerce Act. The Amendment, now codified at 49 U.S.C. § 11706, established a "nationally uniform policy governing interstate carriers' liability for property loss." *New York, N.H. &H.R.Co. v. Nothnagle*, 346 U.S. 128, 131 (1953). Carriers are liable without proof of negligence for damage to goods transported by it.[8] *Secretary of Agriculture v. United States*, 350 U.S. 162 (1956). To promote competition in the rail industry, Congress enacted the Railroad Revitalization and Regulatory Reform Act, Pub.L. No. 94-210, 90 Stat. 31 (1976), which allowed the Interstate Commerce Commission (now the Surface Transportation Board) to exempt certain rail services from railroad regulations. However, Congress limited deregulation to the extent that no exemption order "shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with section 11706 of this title." 49 U.S.C. § 10502(e). Section 10502(e) further provides that "nothing in this subsection or section 11706 of this title shall prevent rail carriers from offering alternative terms nor give the Board the authority to require any specific level of rates or services based upon the provisions of section 11706 of this title."

The origin of the "fair opportunity" doctrine appears to be the following statement by the United States Supreme Court in *New York, New Haven & Hartford R.R. v. Nothnagle*, 346 U.S. 128, 135-36 (1953):

---

[8] Certain affirmative defenses may be available such as that the damage was occasioned by the shipper or acts of God, the public enemy, public authority, or the inherent vice or nature of the commodity.

> [O]nly by granting its customers a fair opportunity to choose between a higher or lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained. . . Binding respondent by a limitation which she had no reasonable opportunity to discover would effectively deprive her of the requisite choice. . .

As noted by the First Circuit, the "fair opportunity" language "has taken on a life of its own, and later circuit cases have treated the rubric as if it were an independent requirement of the Carmack Amendment. What has developed is a continuing controversy about how to decide whether there has been such a 'fair opportunity." *Hollingworth & Vose Co. v. A-P-A Transportation Corp.*, 158 F.3d 617, 620 (1st Cir. 1998). *See Sompo Japan Insurance Co. Of America v. Union Pacific Railroad Co*., 456 F.3d 54, 75 (2nd Cir. 2006)(court must determine whether carrier offered shipper an opportunity, consistent with § § 10502(e) and 11706(a) and (c)(3) to "receive full Carmack liability coverage as well as 'alternative terms."); *Carmana*, *supra,* (3rd Cir.) ("Permitting carriers to limit their liability is a carefully defined exception to the Carmack Amendment's general objective of imposing full liability for the loss of shipped goods; courts, thus, carefully scrutinize agreements purporting to limit such liability." In order to limit liability, carriers must "obtain the shipper's agreement as to his choice of liability" and "give the shipper a reasonable opportunity to choose between two or more levels of liability". "A reasonable opportunity to choose between different levels of coverage means that the shipper had both reasonable notice of the liability limitation and the opportunity to obtain information necessary to making a deliberate and well-informed decision."); *Tokio Marine and Fire Insurance Co., Ltd. v. Amato Motors, Inc*., 996 F.2d 874, 879 (7th Cir. 1993) ("However, consistent with the reasons for deregulation, Congress gave carriers increased latitude in offering 'alternative terms' to shippers. Thus, since deregulation, rail carriers still must offer full value rates, but they may offer alternative

terms as well."); *Comsource Independent Food Service Companies, Inc. v. Union Pacific Railroad Company,* 102 F.3d 438, 444 (9th Cir. 1996)(relevant factors include "whether the provision in the tariff was 'specifically brought to the shipper's attention', "the shipper's 'sophistication, abundant experience, or extensive prior dealings with a carrier". ..; "whether the shipper drafted the contract and directly negotiated its terms'; and "whether the tariff provision was specifically reproduced in the bill of lading."); *Siren, Inc. v. Estes Express Lines*, 249 F.3d 1268, 1274 (11th Cir. 2001)("[W]hen a shipper drafts a bill of lading, incorporating language which is universally understood throughout the motor carrier industry to limit the liability of the carrier, said shipper will be bound by the terms of the contract, irrespective of whether the shipper had actual knowledge of those terms.")

The Fourth Circuit has apparently not addressed this issue.[9] However, two cases from the District of Maryland have addressed similar issues. In *Aida Dayton Technologies Corp. v. Trism Specialized Carriers, Inc.*, 178 F.Supp.2d 505 (D.Md. 2001), a shipper brought an action against a motor carrier to recover for damage to a machine press when it fell from a tractor-trailer. The carrier argued that the case was barred by a negotiated limitations period. On cross motions for summary judgment, the Court considered the *Comsource* factors in finding there were material issues of fact. It found that summary judgment "is seldom appropriate when a court is required to resort to circumstantial evidence of record in its interpretation of a contract." The Court cited *World-Wide Rights Ltd. Partnership v. Combe, Inc.*, 955 F.2d 242, 509 (4th Cir. 1992):

---

[9] In *Shao*, after determining that the plaintiff's state law claims were preempted, the Court remanded the case to determine various issues including the terms of the contract between the shipper and the carrier as to the limitation period. "The Carmack Amendment thus contemplates that limitation periods are terms to be bargained over between shipper and carrier, so long as the minimum conditions of § 11707(e) [now § 11706(e)] are met." *Shao*, 986 F.2d at 707-08. The Court notes that *Shao* dealt with limitations periods rather than liability limits.

15

> Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if "susceptible of two reasonable interpretations." [Citation omitted]. The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if that evidence is, as a matter of law, dispositive of the interpretive issue, grant summary judgment on that basis. [Citation omitted]. If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.

In denying the motions for summary judgment, the court pointed out that all inferences to be drawn from facts of record must be viewed in a light most favorable to the opposing party and that summary judgment is "seldom appropriate in cases in which particular states of mind are decisive as elements of a claim or defense." *Id.*, 178 F.Supp.2d at 510.

The Court cited another case from the District of Maryland, *Acro Automation Sys., Inc. v Iscont Shipping Ltd.*, 706 F.Supp. 413 (D.Md. 1989), written by Judge Niemeyer, the subsequent author of the *Shao* opinion. In *Acro*, the Court faced the issue whether under the Carmack Amendment a carrier had limited its liability for damage to equipment which it transported. The Court found that there was evidence that the shipper signed the bill of lading after the goods were delivered and only evidences receipt of the cargo. "It can hardly be inferred that the shipper was given a choice, exercised the choice, and chose to limit liability when given a blank bill of lading after delivery." The court cited *Anton v. Greyhound Van Lines, Inc.*, 591 F.2d 103, 107-8 (1st Cir. 1978) for the proposition that "a carrier cannot limit liability by implication. There must be an

absolute, deliberate and well-informed choice by the shipper."[10]

In the case at bar, the evidence as to the terms of the contract regarding limitation of liability is conflicting. There is no express limitation of liability in the bill of lading, only a reference to the value of the cargo of $1,712,440 and the NS Rate Authority NSRQ 63768, which itself references the $100,000 liability limit.  The Conditions of Carriage, on the other hand, refer to full liability limits applying unless otherwise agreed. The only witness relied upon by the defendants, Scott, has indicated that he may still maintain a business relationship with Norfolk Southern and that his employment was terminated by TransLink. Scott's testimony is somewhat contradictory in that he testified that he had agreed to the $100,000 liability limit in order to obtain lower shipping rates, but he signed the claim form requesting $1,712,440. It is also unclear whether Norfolk Southern gave the shipper a "fair opportunity" to choose alternate rates, although the bill of lading was prepared by the shipper who appears to be experienced in the industry. There was also evidence of the extra charge for the "high value" shipment and the special instructions about taking care with transporting the transformer. The Court finds there are sufficient questions of fact to preclude a grant of summary judgment.  The Court simply cannot determine as a matter of law at this juncture that the contract was unambiguous in limiting liability and that Defendant gave the plaintiff's assignor a "fair opportunity" to choose alternate rates.  At this stage, it is not the Court's function to weigh the evidence, but rather to determine whether there is a genuine issue of fact which justifies a trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)

Based on the briefs and information submitted, I find as a matter of law that any claims by the plaintiff based upon state or federal common law are preempted by the Carmack Amendment.

---

[10] *See, e.g., Arnell v. Mayflower Transit, Inc.*, 968 F.Supp. 521 (D.Nev. 1997).

Therefore, defendant's motion for summary judgment is granted in part as to any state or federal common law claims.  The motion for summary judgment is denied as to defendant's remaining arguments.

For the foregoing reasons, the undersigned **GRANTS IN PART AND DENIES IN PART** the defendant's motion for summary judgment.

**AND IT IS SO ORDERED.**

s/ R. Bryan Harwell  
R. Bryan Harwell  
United States District Court Judge

February 5, 2008  
Florence, South Carolina