IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| HANSA MEYER TRANSPORT<br>GMBH & CO., KG | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 8:06-cv-00924 |
| | ) | |
| vs. | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| NORFOLK SOUTHERN RAILWAY<br>COMPANY | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Hansa Meyer Transport GmbH & Co., KG ("Hansa Meyer"), filed this action pursuant to the Carmack Amendment[1] to recover damages for the destruction of a transformer during its transportation via train by Defendant, Norfolk Southern Railway Company ("Norfolk Southern"). Hansa Meyer claims the transformer was destroyed during a train derailment on March 23, 2004 at Norfolk Southern's Greenville, South Carolina yard. This Court issued an Order on February 5, 2008 granting the defendant's motion for summary judgment as to state and federal common law claims[2] and denying the defendant's motion for summary judgment as to the Carmack Amendment. Inasmuch as neither party requested a jury trial, this matter came before the Court for a bench trial on February 12 and 13, 2008.

After reviewing the exhibits presented by the parties and hearing the testimony of the witnesses, this Court has duly considered the relevancy and weight of the evidence and has assessed the credibility

---

[1] The Carmack Amendment is codified at 49 U.S.C. § 11706.

[2] Plaintiff's complaint contained causes of action for breach of contract and indemnification.

-1-

of the witnesses. Based on all of the evidence, this Court finds that Plaintiff has established its *prima facie* case under the Carmack Amendment and that the defendant has not proved a defense to a Carmack Amendment claim other than a limitation of liability, wherein the plaintiff's damages are limited to $100,000. The Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that any Findings of Fact constitute Conclusions of Law, or vice versa, they shall be so regarded.

## I. FINDINGS OF FACT

1. VA Tech Elin Transformatoren GmbH & Company ("VA Tech") of Weiz, Austria manufactured and sold the subject transformer to its customer, Duke Energy Corporation ("Duke Energy") for installation in its Anderson, South Carolina plant.

2. VA Tech hired Hansa Meyer, a German freight forwarding company, to arrange for the transportation of the transformer from Austria to Duke Energy's plant.

3. In order to facilitate the transportation of the transformer in the United States, Hansa Meyer requested Alliance International Forwarders, Inc. ("Alliance") of Houston, Texas to act as its agent with respect to arranging for the transportation of the transformer between Portsmouth, Virginia, the port of entry, and Anderson, South Carolina. Alliance, in turn, contracted with TransLink, Inc. ("Translink")[3] to obtain rate quotes for the rail carriage of the transformer from Portsmouth to the job site. Translink had provided transportation services to Alliance on many occasions.

4. Translink, through its general manager Michael Scott, requested and received a freight rate offer from Norfolk Southern. Scott was familiar with the various available rates, as discussed more

---

[3] The Bill of Lading refers to Translink as an agent of Land Transportation. Land handled the billing for transactions negotiated by Translink. On the Bill of Lading, the shipper is listed as Translink.

-2-

fully below.

5. Michael Scott went to work for Translink in 2002, after 24 years working for the railroads. He was employed as a manager specializing in the handling of oversized and over-dimensional shipments during fifteen (15) of his twenty-four (24) years working for railroads. At Translink, Scott was general manager and oversaw the day-to-day operations of the company. Scott is currently self-employed by H.L.I. Rail and Rigging, which he partially owns, and which does business with Norfolk Southern. Translink is also currently one of Scott's customers. Scott requested rate quotes from railroads on "hundreds" of occasions prior to the rail movement at issue in this case. Scott considers himself to be a "sophisticated" purchaser of rail services. Scott considered his contact at Alliance, Mr. Mario Cassier, to be a "sophisticated" freight forwarder. (Tr. p. 163).[4]

6. Scott stated that Translink's customer, Alliance, was trying to minimize transportation costs. Therefore, he entered into negotiations with Norfolk Southern in order to secure a rate lower than the public rate offered by Norfolk Southern. Scott was able to obtain a 25% reduction in the rate from Norfolk Southern as a result of his negotiations with the railroad. (Defendant's Exhibit 3).[5] On January 19, 2004, Scott asked Norfolk Southern to publish the reduced rate for the rail movement. (Defendant's Exhibit 3). Norfolk Southern published the reduced rate in a document entitled Norfolk Southern Price Authority NSRQ 63768 ("NSRQ 63768") and forwarded the same to Scott on January 21, 2004. (Defendant's Exhibit 4). NSRQ 63768 expressly incorporates the rules and provisions of Norfolk Southern Railway Conditions of Carriage #1-D and any supplements or reissues thereof. (Defendant's Exhibits 4 and 12). Norfolk Southern Conditions of Carriage #1-E cancels Norfolk Southern Conditions

---

[4] All transcript references are to Volume One of the Trial Transcript dated February 12, 2008.

[5] The parties agreed to a rate of $4.83 per hundred weight based on a 250,000 pound minimum.

of Carriage #1-D. Its provisions are therefore incorporated into NSRQ 63768. ( Defendant's Exhibits 4 and 12). Norfolk Southern Conditions of Carriage #1-E provides that, "unless modified in a transportation contract or a general or customer specific rate quotation, NS will assume liability for loss and damage under the terms of 49 U.S.C. § 11706 and the terms of the Uniform bill of lading as specified in Rule 150 herein. (Defendant's Exhibit 12). One of the note references in NSRQ 63768 states: "Shipments tendered under rates published herein are restricted to carrier liability not to exceed $ 100,000 per shipment." As part of the rate quote, Norfolk Southern charged for use of a heavy duty flat car. (Defendant's Exhibits 4 and 5 and Plaintiff's Exhibit 14).

7. Translink had complete access to Norfolk Southern Conditions of Carriage incorporated into NSRQ 63768, and, in fact, Scott was able to obtain this information from Norfolk Southern's website. Scott knew that NSRQ 63768 expressly limited Norfolk Southern's liability to $100,000.00 per shipment and agreed to this limitation of liability in order to obtain a reduced freight rate from Norfolk Southern. Scott testified that Translink was not charged any rates by Norfolk Southern which would alter the limitation of liability contained in NSRQ 63768. Scott had previously requested rates from Norfolk Southern which provided full value liability coverage for other rail movements on at least a dozen occasions. Rates provided to Scott by Norfolk Southern which provided a limitation of liability were lower than rates which provided for full value liability on the part of Norfolk Southern. With respect to the rail movement, Scott did not request a rate from Norfolk Southern which provided full value liability coverage because Translink's customer, Alliance, "did not want" full value liability coverage. Neither Alliance, Hansa Meyer, nor VA Tech ever asked Translink to obtain a rate for rail transportation for the rail movement which provided for full liability on the part of Norfolk Southern. Scott testified that he could have requested a rate from Norfolk Southern which provided full value

liability coverage. Scott testified that if his customer, Alliance, had instructed Translink to obtain a rate from Norfolk Southern which provided full value liability coverage, he would have obtained such a rate from Norfolk Southern. Scott had seen hundreds of rate quotes from Norfolk Southern similar to NSRQ 63768 prior to the Rail Movement. The rates charged to Translink by Norfolk Southern for the Rail Movement had no relation to, and were in no way dependent upon, the value of the freight involved in the Rail Movement. Scott testified that the fact that Translink designated the freight involved in the Rail Movement as a "high value load" and listed the value of the freight as $1,712,440.00 on the Bill of Lading did not result in any additional charges by Norfolk Southern and was not intended to alter the limitation of Norfolk Southern's liability. Translink advised Norfolk Southern that the rail movement would be subject to NSRQ 63768. (Defendant's Exhibit 7). Translink and its principal, Alliance, paid a "considerably" lower rate by notifying Norfolk Southern that Translink was agreeing to have the terms of NSRQ 63768 govern the Rail Movement.

8.   The Court finds that Scott's testimony was credible and that he was a sophisticated businessman with many years of experience in the railroad rate business.

9. Translink prepared a "Bill of Lading" covering the rail carriage in question and provided it to Norfolk Southern. ( Plaintiff's Exhibit 6 and Defendant's Exhibit 7)  Norfolk Southern did not prepare a separate or different bill of lading, and the bill of lading prepared by Translink was the only bill of lading issued covering this rail movement. (Plaintiff's Exhibit 6 and Defendant's Exhibit 7)

10. Due to the transformer's weight (441,146 pounds), length (26'8"), width (1171") and height (15'6"), the transformer was very large and heavy, requiring the use of a heavy duty flat rail car. ( Plaintiff's Exhibit 14).  Based upon the transformer's value, it was considered to be a High Value load by Norfolk Southern.  (Plaintiff's Exhibits 18 and 19).

11. The transformer was in good condition when it was loaded onto the Norfolk Southern railcar. The testimony of Franz Dunkl was presented by deposition.  Dunkl, who was head of the customer service division at VA Tech, personally inspected the transformer at the derailment site, both externally and internally, and was in the best position to determine the condition of the transformer. Dunkl Deposition, p. 5 line 19 through page 6, line 2., page 6, line 19 through 25, page 19, line 4 through page 28, line 12.; page 35, line 22 through page 39, line 23.  Dunkl stated that based upon the data he downloaded from the impact recorders, a device used to determine any impact sustained by the transformer, his review of the data showed that everything was normal except on the 23rd of March, when the transformer fell over, which was a major impact. He stated that the light on the impact recorders was red, indicating something happened to the transformer, but it was already obvious that something had happened to the transformer.  Dunkl Deposition, page 28, line 13 through page 31, line 21[6]; page 42, line15 through page 48, line 11; page 48, line 20 through page 53, line 10; page 53, line 19 through page 58, line 11; page 62, line 6 through 10; page 63, line 13 through page 65, line 21; page 82, line 12 through page 83, line 5; page 96, line 2 through page 97, line 2; page 113, line 5 through line 23; page 115, line 19 through page 116, line 6; page 121, line 5 through line 18.  In addition, the VA Tech Damage - Report (Plaintiff's Exhibit 29, Dunkl Deposition Exhibit 5) indicates on pages 4 through 6 that the transformer's impact with the cement as a result of the derailment resulted in crushing of the transformer's lateral supports and other parts being pinched against the wall of the transformer, the bending of other parts of the transformer, and the movement, braking and misalignment of additional

---

[6] Defendant has objected to admission into evidence of various portions of the testimony of Dunkl, James Bryant, and Christopher Taylor.  *See* "Deposition Designations with Objections and Responses," Docket entry #94, p. 3. The Court overrules all objections for the reasons argued by the plaintiff and also admits into evidence defendant's counter-designations.

parts. Dunkl testified at deposition that he prepared the report to give everyone an idea of what happened leading to the conclusion that the transformer was a constructive total loss. Dunkl Deposition, page 31, lines 3 through 10. Dunkl confirmed, as did evidence introduced throughout the trial, that the damages caused by the derailment rendered the transformer a constructive total loss.

Documents submitted into evidence also indicate that a Norfolk Southern inspector inspected the transformer and railcar and approved the condition of the transformer and car. This inspection was confirmed by the Ewig International Marine Corporation Survey Report NYC 116458, an e-mail sent by Traci Young of Alliance (Plaintiff's Exhibit 32), a letter sent by Norfolk Southern to Translink about the transformer at the time of its loading onto the railcar (Plaintiff's Exhibit 15), and a Norfolk Southern Mechanical Department High Value Shipment Inspection Report stating there were no exceptions to the transformer or car (Plaintiff's Exhibit 18). There was nothing submitted into evidence indicating that a Norfolk Southern employee took exception to the condition of the transformer, or indicating that Transformer was not in good condition when received by Norfolk Southern. In addition, according to the testimony of Scott, the transformer was inspected by Norfolk Southern in Portsmouth, Virginia. (Tr. 236).

Norfolk Southern Form For Presentation of Loss of and Damage Claim (Plaintiff's Exhibit 39), Norfolk Southern employees DR Carter and RL Collins' report dated March 23, 2004 (Plaintiff's Exhibit 12, p. 3) and Norfolk Southern employee C. J. Veal's report dated March 24, 2004 (Plaintiff's Exhibit 12, pp. 21- 22) all indicate the transformer was damaged as a result of the derailment. Veal's report states that Dunkl and Dr. Elias Strangus, an Associate Professor of Electrical & Computer Engineering from Michigan State University hired by Norfolk Southern to inspect the transformer, agreed that the transformer suffered "considerable interior damage" as a "result of the impact when the

transformer landed on the ground."  This statement by Veal is an acknowledgment on behalf of Norfolk Southern that the derailment caused the transformer to be damaged and had to be "decommissioned". Norfolk Southern's acknowledgment was further confirmed by the testimony of Dunkl and Blazer and the VA-Tech Damage - Report (Dunkl Deposition Exhibit 5).

12. The Norfolk Southern yard where the derailment occurred consisted of two main lines and several spur tracks.  Spurs are used to store and assemble railroad cars.  The railcar on which the transformer was loaded was transported on a secondary or spur track in the Norfolk Southern Greenville, South Carolina yard.

13. Norfolk Southern used three six-axle locomotives to move the transformer on the spur track. While the transformer was being moved, a train derailment occurred, causing the transformer to strike the ground.  The Court finds that the sole cause of the damage to the transformer was the derailment, contrary to the defendant's arguments that the transformer may have been damaged prior to being transported by Norfolk Southern.

14. The damage to the transformer was so extensive that V A Tech determined  it was not cost effective to repair it.  This conclusion was accepted by Norfolk Southern.[7]

15. In a written letter of claim dated March 24, 2004, Translink, on behalf of Alliance, placed Norfolk Southern on notice that it was being held liable for all damage that occurred because of the derailment. (Plaintiff's Exhibit 38).  On or about December 22, 2004, a further form was prepared by Translink and sent to Norfolk Southern, again making a claim for the damages to the subject

---

[7] Defendant asserts that 26 packages of accessories were shipped and not damaged and that the $1.7 million value includes some miscellaneous costs, such that the entire $1.7 million was not lost. It also asserts that the transformer was sold for salvage for $20,000. The Court has not included a factual finding regarding these matters since the Court finds that the $100,000 limitation of liability applies.

transformer due to the derailment, and claiming damages in the total amount of $1,712,440.00. (Plaintiff's Exhibit 39). Although Scott knew that NSRQ 63768 expressly limits Norfolk Southern's liability to $100,000.00 per shipment and agreed to this limitation of liability in order to obtain a reduced rate from Norfolk Southern, Scott submitted the claim to Norfolk Southern for damage to the Transformer in the amount of $1,712,440.00 because he was instructed to do so by his customer, Alliance, notwithstanding the fact that he had advised Alliance of the limitation of liability both before and after the derailment. (Tr. pp. 184, 195; Defendant's Exhibits 5 and 8).

16. Translink prepared and executed two Assignments of Claim and Agreement, whereby Translink assigned to Hansa Meyer the right to claim directly against Norfolk Southern for the subject loss pursuant to the Contract of Carriage between Translink and Norfolk Southern. (Plaintiff's Exhibits 8 and 9).

17. At the time of the loss, VA Tech was the owner of the transformer. VA Tech made a claim against Hansa Meyer for the damage caused to the transformer as a result of the derailment. Plaintiff has now settled with the owner and its insurer by making a payment in the amount of EURO 950,000, which the Court estimates based upon exchange rates from "Yahoo! Finance", http://finance.yahoo.com to be around $1,558,000.[8]

18. The plaintiff has satisfied its *prima facie* case, and the defendant has failed to prove a

---

[8] On March 26, 2008, after the bench trial had concluded in February, Plaintiff filed a Motion to Reopen Evidence, Docket Entry #103, requesting the court to reopen the record in order to admit into evidence the settlement on March 11, 2008 by Hansa Meyer with VA Tech and its insurer in the amount of EURO 950,000.00. Defendant filed a response opposing the reopening of the record. The decision whether to reopen the record is in the court's discretion. The Court finds that the fact and amount of the settlement are relevant to the issues before the court and does not result in prejudice to the defendant. The motion is accordingly granted. *See United Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971).

defense to the claim, as discussed below in the Conclusions of Law. However, as also discussed below, the Court finds that the parties agreed to a $100,000 limit of liability.

19. Plaintiff presented as a fact witness Mr. Herman Witt in an effort to show that the tracks were rotten. Witt has never had the responsibility of inspecting rail track during 37 years of working for a railroad. Tr. p. 81, line 19 through p. 82, line 19. Witt does not do investigations to determine the cause of derailments. Tr. p. 77, line 24 through p. 78, line 5. Witt conducted his inspection of the transformer on March 25, 2004. Tr. p. 83, line 9-13. Witt testified that some existing ties in the derailment location were still in pretty good condition. Tr. p. 85, line 5-11. Witt testified that side tracks and outside tracks, such as the track where the derailment occurred, are used for the placement of high value loads during rail transportation. Tr. p. 93, line 8-18; Tr. p. 94, line 24 through p. 95, line 10. Plaintiff also presented Mr. William H. Blazer, another fact witness. Blazer testified that the railroad ties removed from the area where the derailment occurred were "aged and had some sun bleach" compared to the new railroad ties used to repair the area where the derailment occurred, but Blazer could not state whether there were more cracks in the new ties or the ties removed from the area of the derailment. Tr. p. 148, line 16 through p. 149, line 18.

Prior to the derailment on March 23, 2004, track number ten in the north yard in Greenville was last inspected on February 19, 2004 by James P. Brannon. Taylor Deposition p. 35, line 15-19; Bryant Deposition p. 60, line 12-16 and 21-22; Bryant Deposition p. 61, line 20-24; Plaintiff's Exhibit No. 12 at pp. 1, 5; Plaintiff's Exhibit No. 19 p. 4, 9, 12. James P. Brannon is an assistant track supervisor for Norfolk Southern. Bryant Deposition p. 61, line 1-2. Brannon found no evidence of a problem during his inspection on February 19, 2004, of the track where the derailment subsequently occurred. Bryant Deposition p. 84, line 1-6; Bryant Deposition p. 90, line 5-13; Bryant Deposition p. 129, line 18-25;

-10-

Bryant Deposition p. 152, line 7 through p. 153, line 12. The condition of the track where the derailment occurred did not indicate that the track was unsafe for rail transportation. Bryant Deposition p. 117, line 1- 17; Bryant Deposition p. 129, line 18-25; Bryant Deposition p. 152, line 7 through p. 153, line 12. Visible cracks in railroad ties do not indicate that the track is unsafe for rail transport. Bryant Deposition p. 103, line 13 through p. 104, line 2; Bryant Deposition p. 104, line 21 through p. 105, line 7; Bryant Deposition p. 110, line 10-21; Bryant Deposition p. 111, line 16 through p. 112, line 8. The FRA requires that only five (of 22) railroad ties beneath a section of rail 39 feet long must be in non-defective condition in a rail yard. Bryant Deposition p. 149, line 13 through p. 147, line 14. Raised spikes do not indicate that the track is unsafe for transport. Bryant Deposition p. 114, line 14 through p. 116, line 14; Bryant Deposition p. 104, line 21 through p. 105, line 7; Bryant Deposition p. 110, line 10-21; Bryant Deposition p. 111, line 16 through p. 112, line 8. Brannon was scheduled to inspect the track where the derailment occurred on March 24, 2004, thus complying with FRA Regulations regarding track inspection. Plaintiff's Exhibit No. 19 pp. 4, 9, 12. In a rail yard, the FRA requires that track be visually inspected on a monthly basis with at least a twenty calendar day interval between inspections. Bryant Deposition p. 63, line 15-23; Defendant's Exhibit No. 10; 49 C.F.R. § 213.233. The wood fibers inside a railroad tie can be deteriorated and such deterioration is not detectable by visual inspection. Bryant Deposition p. 31, line 1-10; Bryant Deposition p. 152, line 7 through p. 153, line 12. There is no test that Norfolk Southern could use to test for deterioration of the fibers on the inside of railroad ties. Bryant Deposition p. 31, line 1-10. Bryant worked as an assistant track supervisor where his primary responsibility was track inspection. He also worked as a track supervisor who the assistant track supervisor reports to and who is also responsible for maintenance as well as well as inspecting track. Bryant then became an assistant division engineer who inspects track, schedules

maintenance and supervises track supervisors and assistant track supervisors.    Bryant Deposition p. 48, line 16 through p. 49, line 13;  Bryant Deposition p. 50, line 2-18. Bryant has been an assistant division engineer since 1979.    Bryant Deposition p. 51, line 13-2. The Greenville yard is within Bryant's division. Bryant Deposition p. 52, line 19-21. Norfolk Southern prepares daily track inspection reports as required by the Federal Railroad Administration ("FRA") and maintains these records for a period of one year from the date of inspection pursuant to FRA Regulations.  Bryant Deposition p. 58, line 3-14; 49 C.F.R. § 213.233.

## CONCLUSIONS OF LAW

**Jurisdiction**

This Court has original jurisdiction over claims brought pursuant to 49 U.S.C. § 11706, the statute governing liability of rail carriers under receipts and bills of lading referred to as the Carmack Amendment, where the amount in controversy for the bill of lading exceeds $10,000, exclusive of interest and costs. 28 U.S.C. § 1337(a).[9]

**Standing of Plaintiff, Hansa Meyer**

Norfolk Southern contends that Hansa Meyer is not entitled to recover for the damage to the transformer, as it was neither the owner of the transformer nor the shipper and has not suffered any damages.  Norfolk Southern's contentions are not supported by the Carmack Amendment.  The Act provides that the "rail carrier. . . (is) liable to the person entitled to recover under the receipt or bill of

---

[9] "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies; *Provided, however*, That the district courts shall have original jurisdiction of an action brought under section 11706 or 14706 of title 49, only if the matter in controversy for each receipt or bill of lading exceeds $10,000, exclusive of interest and costs." 28 U.S.C. § 1337.

lading." 49 U.S.C. § 11706(a).[10]  Under the Carmack Amendment the lawful holder of the bill of lading

may sue the rail carrier for loss or damage to goods without proving ownership. *Pennsylvania R. Co. v.*

*Olivit Bros*., 243 U.S. 574 (1917) (construing prior statutory language referring to "lawful holder" of bill

lading).  The rights of action under the bill of lading may be properly assigned to another, who is then entitled

to maintain the action against the rail carrier as the real party in interest. *See Harrah v. Minnesota Min. and*

*Mfg. Co.*, 809 F. Supp. 313, 318 (D.N.J. 1992).

In the case at bar, Translink was the "shipper" under the Bill of Lading, even though the actual

entity behind the rail carriage booking was the plaintiff, acting through its U.S. agent, Alliance. As such,

Translink had the right to recover the shipment under the bill of lading issued for the subject rail

movement. Translink, as shipper, and at the request of Alliance, sent a written notice of claim to

Norfolk Southern. In addition, Translink assigned all of its rights as the shipper under the contract of

carriage with Norfolk Southern to Hansa Meyer. Accordingly, Hansa Meyer was assigned all rights of

Translink under the bill of lading, including the right to initiate the instant action against Norfolk

Southern for the damages caused to the transformer.

Under the NS Conditions of Carriage #1-E ("terms and conditions"), "Shipper" is defined as

"the party that enters into the contract of carriage with NS or the originating rail carrier."  Rule 100 -

Definitions section of the conditions of carriage  further states "The Shipper may be acting on its own

behalf or on the behalf of another party....the Shipper might or might not be the owner of the

lading...The Shipper may file a claim with NS for loss or damage to lading under Rule 290 below."

Under section (1)(b), it provides, "A claim may be filed by either the Shipper or the Consignee.  Any

---

[10] A bill of lading is a contract which records that a carrier has received goods from the shipper,
states the terms of carriage, and evidences a contract of carriage. *Norfolk S. Ry. Co. v. Kirby*, 543 U.S.
14, 18-19 (2004).

other party who desires to file a claim with NS must secure first an assignment of claim from the Shipper or Consignee."

The evidence introduced and received at trial shows that Norfolk Southern adopted the Bill of Lading issued by Translink and used it to govern the carriage of the transformer. Under the Bill of Lading, Translink was listed as the shipper. This is supported by the Norfolk Southern Freight Detention Bill (Plaintiff's Exhibit 24), which lists Translink as the shipper and consignee. Norfolk Southern responded to the claim submitted by Translink in a manner which indicates that Norfolk Southern considered Translink to be the shipper and hence, the proper party to file the claim for the damage to the transformer (Defendant's Exhibit 9).

Under the Carmack Amendment and the Norfolk Southern terms and conditions, the shipper under the Bill of Lading or the assignee of the shipper is permitted to file an action against Norfolk Southern. Translink, as shipper, assigned its rights to file a claim against Norfolk Southern to Hansa Meyer for the damage to the transformer. This was done pursuant to the Norfolk Southern terms and conditions. Pursuant to the two assignments of claims (Plaintiff's Exhibits 8 and 9), Translink has assigned its claims as the shipper to Hansa Meyer. As such, Hansa Meyer is permitted to bring suit against Norfolk Southern for damage to the transformer.

**Carmack Amendment**

"The Carmack Amendment was enacted in 1906 as an amendment to the Interstate Commerce Act of 1887. *See* Act of June 29, 1906, ch. 3591, 34 Stat. 584. *Ward v. Allied Van Lines, Inc*., 231 F.3d 135, 138 (4th Cir. 2000). The Amendment is now codified, as it pertains to rail carriers, at 49 U.S.C. § 11706. "The Amendment requires, among other things, that a carrier transporting property issue a bill of lading . . . to the shipper and makes the carrier liable to the one entitled to recover under the bill of

-14-

lading . . . for loss of or injury to the property." *Shao v. Link Cargo (Taiwan) Ltd.*, 986 F.2d 700, 704 (4th Cir 1993). Congress enacted the Carmack Amendment 'to create a national scheme of carrier liability for goods damaged or lost during interstate shipment under a valid bill of lading." *Id.* "In October of 1980, Congress enacted the Staggers Rail Act. Pub. L. No. 96-448, 94 Stat. 1895 (1980). The purpose of the Act was to rid railroads of unnecessary and inefficient regulations that impeded the railroads' ability to compete with other modes of transportation. . . Congress authorized the ICC to exempt persons or services from regulation in certain situations, 49 U.S.C. § 10505(a). . . However, Congress did not confer on the ICC unlimited authority to deregulate, but rather stated certain specific limitations. One such limitation is found at 49 U.S.C. § 10505(e)(the Matsui Amendment). . ." *Tokio Marine and Fire Insurance Company, Ltd. v. Amato Motors, Inc*, 996 F.2d 874, 877 (7th Cir. 1993). Section 10505(e) is now codified as 49 U.S.C. § 10502(e) and provides:

> No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are inconsistent with the provisions of section 11706 of this title. Nothing in this subsection or in section 11706 of this title shall prevent rail carriers from offering alternative terms nor give the Board the authority to require any specific level of rates for services based upon the provisions of section 11706 of this title.

Under the Carmack Amendment, a shipper establishes a *prima facie* case for recovery against a common carrier if it proves (1) receipt by the carrier of the goods in good condition, (2) arrival of the goods at the destination in damaged condition and (3) the amount of damage. *Oak Hall Cap & Gown Co., Inc. v Old Dominion Freight Line, Inc.*, 899 F.2d 291 (4th Cir. 1990).

Norfolk Southern argues that Hansa Meyer has failed to establish a *prima facie* case for the recovery against it, because Hansa Meyer did not establish the delivery of the transformer to it in good condition. Given the evidence presented and as cited in the Findings of Fact, I find that the transformer

-15-

was delivered to Norfolk Southern in good condition and was subsequently damaged while being transported by Norfolk Southern.  The Court has already found that plaintiff has standing based on the fact that the owner of the goods, VA Tech, through its subrogated cargo underwriters, made a claim against Hansa Meyer which has now been settled by a payment made by Hansa Meyer (or on its behalf) for the loss of the transformer. The damages caused to the transformer rendered it a constructive total loss. Therefore, Hansa Meyer has been held accountable for the alleged negligence of Norfolk Southern and has been damaged by the destruction caused to the transformer in at least the amount of the settlement paid. The Court accordingly finds that Hansa Meyer has established a *prima facie* case for recovery against Norfolk Southern under the Carmack Amendment.

"Once a *prima facie* case is established, the burden shifts to the carrier to prove (1) that it was free from negligence, *and* (2) that the damage to the cargo was caused by one of the five excusable factors: was caused by '(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods.'"*A.I.G. Uruguay Compania de Seguros, S.A. v. AAA Cooper,* 334 F.3d 997, 1003 (11th Cir. 2003), citing *Missouri Pacific R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137 (1964).   Norfolk Southern has failed to satisfy this burden.  Even assuming Norfolk Southern was free from negligence, there is no showing that the damage was also caused by one of the five excusable factors set forth above.

The Court will now address the defendant's defense that the contract contained a valid limitation of liability.

### Limitation of Liability

Under the Carmack Amendment, "a rail carrier …  may establish rates for transportation of property under which – (A) the liability of the rail carrier for such property is limited to a value

-16-

established by … a written agreement between the shipper and the carrier." 49 U.S.C. § 11706(c)(3).

The Carmack Amendment imposes absolute liability upon carriers for "the actual loss or injury to

property caused by" a carrier. 49 U.S.C. § 11706. Section 11706 provides, in pertinent part, as follows:

§§ 11706. Liability of rail carriers under receipts and bills of lading

(a) A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part shall issue a receipt or bill of lading for property it receives for transportation under this part. That rail carrier and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Board under this part are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this subsection is for the actual loss or injury to the property caused by

the receiving rail carrier;
(1)
the delivering rail carrier; or
(2)
another rail carrier over whose line or route the property is transported in
(3)
the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading . . .

(c)    (1) A rail carrier may not limit or be exempt from liability imposed under subsection (a) of this section except as provided in this subsection. A limitation of liability or of the amount of recovery or representation or agreement in a receipt, bill of lading, contract, or rule in violation of this section is void . . .

(3) A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part may establish rates for transportation of property under which--

(A) . . . the liability of the rail carrier for such property is limited to a value established by written declaration of the shipper or by a written agreement between the shipper and the carrier; or

(B) . . . specified amounts are deducted, pursuant to a written agreement between the shipper and the carrier, from any claim against the carrier with respect to the transportation of such property.

Under 49 U.S.C. § 10502, which permits exempt contracts of carriage to be undertaken by a rail carrier,

the rail carrier must still provide, as part of its contract, contractual terms consistent with 49 U.S.C. § 11706. If not,

-17-

then any liability provisions imposed by the carrier are void. The pertinent provision from Section 10502, at subsection (e), provides:

> "No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 11706 of this title."

In order to limit its liability under the Carmack Amendment, courts have required a carrier to provide a shipper with a "fair opportunity" to obtain information regarding rates which provide full liability for damage to freight. *See New York, New Haven & Hartford R.R. v. Nothnagle*, 346 U.S. 128, 135-136 (1953); *Chandler v. Aero Mayflower Transit Co.*, 374 F.2d 129, 135 (4th Cir. 1967)(Shipper must have "a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge.")[11]

Two cases from the District of Maryland are instructive in their analysis of similar issues. *See Aida Dayton Technologies Corp. v. Trism Specialized Carriers, Inc.*, 178 F.Supp.2d 505 (D. Md. 2001); *Acro Automation Sys., Inc. v. Iscont Shipping Ltd.*, 706 F.Supp. 413 (D. Md. 1989). The Court in *Aida* was faced with determining whether a carrier had limited the time limitations for filing suit to a period shorter than that provided for in the Carmack Amendment. In performing its analysis, the *Aida* Court turned to the factors set forth in *Comsource Independent Food Service Companies, Inc. v. Union Pacific Railroad Co.*, 102 F.3d 438 (9th Cir. 1996). The *Comsource* Court had also been faced with determining whether a carrier had limited the time limitations for filing suit to a period shorter than that provided for in the Carmack Amendment. In

---

[11] The Fourth Circuit in *Caterpillar Overseas, S.A. v. Marine Transport Inc.*, 900 F.2d 714 (4th Cir. 1990) discussed the "fair opportunity doctrine" in the context of the Carriage of Goods by Sea Act (COGSA). It found that the bill of lading did not in express terms give the shipper an opportunity to choose certain provisions but that, since the long-form bill of lading was posted at various locations, filed with the Maritime Commission, and "available upon request", knowledge of the alternate terms was imputed to the shipper.

performing its analysis, the *Comsource* Court found *Hughes Aircraft Co. v. North Amer. Van Lines, Inc.*, 970 F.2d 609 (9th Cir. 1992), to be instructive. In *Hughes*, the Ninth Circuit discussed a tariff provision limiting a carrier's liability for property damage. The *Hughes* Court held that a carrier could limit its liability for damage to freight only if the shipper was given "reasonable notice of the liability limitation and the opportunity to obtain information necessary to making a deliberate and well-informed choice." *Comsource*, 102 F.3d at 444. The *Comsource* Court held that the same test was applicable to provisions in carrier's contracts limiting liability or the time in which to file suit. *Id.* The *Comsource* Court noted that the following factors should be considered in determining whether a shipper had been provided "reasonable notice of the liability limitation and the opportunity to obtain information necessary to making a deliberate and well-informed choice":

> 1. Whether the provision providing the limitation was specifically brought to the shipper's attention;
> 2. The shipper's sophistication;
> 3. The shipper's abundant experience;
> 4. The shipper's extensive prior dealings with the carrier;
> 5. Whether the shipper drafted the shipping contract;
> 6. Whether the shipper directly negotiated the terms of the shipping contract; and
> 7. Whether the provision providing the limitation was specifically produced in the bill of lading.

*Comsource*, 102 F.3d at 444 (citations omitted).

In the instant case, the shipper, Translink, through Scott, had notice of the limitation of liability. The shipper, Translink, was a sophisticated shipper and had abundant prior experience in rail shipping and rail contract negotiation. Translink had extensive prior dealings with Norfolk Southern. Translink drafted the Bill of Lading which governed the Rail Movement on March 15, 2004, prior to Norfolk Southern moving the shipment. Translink directly negotiated the use of NSRQ 63768 with Norfolk Southern which Translink then incorporated into the Bill of Lading drafted by Translink. Translink had notice of the provisions of, knew how

to access, and did access Norfolk Southern Conditions of Carriage #1-E from Norfolk Southern's website. Norfolk Southern Conditions of Carriage #1-E provides in pertinent part, under Rule 290 entitled "Loss of and Damage to Shipments," under section 1(1)(a), "unless modified in a transportation contract or a general or customer specific rate quotation, NS will assume liability for loss and damage under the terms of 49 U.S.C. § 11706 and the terms of the uniform bill of lading as specified in Rule 150 herein." Translink intentionally and knowingly agreed to the limitation of liability provision in exchange for reduced shipping rates. Translink knew that it could obtain rates from Norfolk Southern, which would provide full liability for damage to freight, and had obtained such rates on numerous prior occasions. The owner of the freight, VA Tech, had full liability coverage for any damage to freight occurring during transportation through its insurer, and VA Tech filed a claim with that insurer which was paid.. Translink made a deliberate and well-informed decision to ship the transformer under a Bill of Lading which provided for a limitation of Norfolk Southern's liability in order to obtain a reduced rate for the rail movement.

In *Acro*, Judge Niemeyer, now of the Fourth Circuit, was faced with determining whether a carrier's liability for property damage was limited pursuant to a provision in a bill of lading. In *Acro*, the Court held that, in order to limit its liability, a carrier must: (1) Give the shipper a reasonable opportunity to choose between two or more levels of liability; (2) Obtain the shipper's agreement as to his choice of liability; and (3) Issue a bill of lading prior to moving the shipment that reflects the agreement. *Acro*, 706 F.Supp. at 415. In the instant case, the shipper, Translink, had a reasonable opportunity to choose between two or more levels of liability and agreed to a limitation of Norfolk Southern's liability. Translink drafted the Bill of Lading which governed the rail movement on March 15, 2004, prior to the Norfolk Southern moving the shipment. The Bill of Lading incorporated the limitation of liability set forth in NSRQ 63768, which was directly negotiated by the shipper with Norfolk Southern. The Court concludes that Norfolk Southern's liability is

limited to $100,000.00 for the damage to the freight which occurred during the Rail Movement.

**Effect on the Enforcability of the Limit of Liability by Placing Declared Value on Bill of Lading**

Plaintiff contends that, since Translink inserted on the bill of lading the value of the lading, which was the actual value of the transformer, Translink chose a full value liability rate. However, the Court has already found that Scott of Translink did not intend to choose a full liability rate. He specifically testified that the bill of lading form included the value but that this did not mean that a full value liability applied. He made it clear that he had negotiated a low rate in return for a limitation of liability. The record is clear that the rate authority being utilized specifically contained a limitation of liability of $100,000. This argument lacks merit.

**Alleged Fundamental Breach of Special Conditions of Contract of Carriage**

Plaintiff contends that the limitation of liability does not apply because Norfolk Southern's conduct in performing the contract of carriage fundamentally or materially deviates from a special contractually agreed method of transportation relating to the safe handling of the cargo. Plaintiff cites cases holding that, where the shipper contracted for an additional service requiring specialized safety measures to reduce the damage to the cargo, the carrier's failure to perform those measures is a sufficient basis upon which the liability limitation may be rescinded. *See Praxair, Inc. v. Mayflower Transit, Inc.*, 919 F.Supp. 650, 656 (S.D.N.Y. 1996); *Nipponkoa Insurance Co., Ltd. v. Watkins Motor Lines, Inc.*, 431 F.Supp.2d 411, 418 (S.D.N.Y. 2006). Plaintiff contends that the contract with Norfolk Southern required special handling for a high value and very heavy shipment via a heavy duty flat car and that the rails were severely deteriorated, thus constituting a fundamental or material deviation.

Defendant responds that the plaintiff is attempting to invoke the material deviation doctrine, which is a rule of admiralty law, and that most federal courts have not applied the material deviation doctrine in Carmack Amendment actions. Defendant contends that the use of the material deviation doctrine is contrary

to the statute's provisions allowing liability limitations and to the Congressional intent to create uniform federal law that governs carriers' obligations. Defendant also contends that, even if the material deviation doctrine applies to Carmack Amendment cases, it only applies where there is evidence of intentional destruction or conversion of the transformer. Finally, it asserts that, if the doctrine is not so limited, then the facts in the case at bar do not fit within the doctrine.

Some courts have held that the material deviation doctrine does not apply to a Carmack Amendment action. *See e.g., Rocky Ford Moving Vans, Inc. v. United States*, 501 F.2d 1369 (5th Cir. 1974). Other courts find the doctrine is only applicable to Carmack Amendment cases involving intentional destruction of property. *See American Cyanamid Co. v. New Penn Motor Exp., Inc.*, 979 F.2d 310, 315-316 (3rd Cir. 1992); *Deiro v. American Airlines, Inc.*, 816 F.2d 1360 (9th Cir. 1987); *Rafaella Gallery, Inc. v. Untied Parcel Service, Inc.*, 818 F. Supp. 53 (S.D.N.Y. 1993). As stated by the Third Circuit in *American Cyanamid*,

> . . . nothing short of intentional destruction or conduct in the nature of theft of the property will permit a shipper to circumvent the liability limitations in a released value provision. This is an understandable and desirable result, as a shipper can protect itself from loss by paying for a higher level of protection. Furthermore, when goods are lost or destroyed during transportation, there probably will be many circumstances in which a shipper will be able reasonably to characterize the carrier's conduct as willful, and a rule of law allowing recovery in excess of the released value, if willfulness can be demonstrated, will lead to increased litigation. We think it better that there be certainty in these commercial settings, particularly since the shipper can protect itself by paying for a higher level of protection.

Assuming without deciding that the doctrine applies to Carmack Amendment cases, there has been no showing of a material deviation in the nature of intentional destruction nor as a result of the condition of the track.[12]

---

[12] The Court finds that plaintiff's exhibit 21, a report by a Norfolk Southern employee relating to inspection of track in 2006 is not relevant, where the derailment in this case occurred on March 23, 2004. The exhibit is therefore not admitted into evidence.

-22-

## Conclusion

This matter involved a bill of lading drafted by a sophisticated shipper with extensive experience in rail shipping and prior dealings with Norfolk Southern, who received the benefit of its bargain by receiving a reduced shipping rate.

For the reasons stated, the Court finds in favor of the plaintiff under the Carmack Amendment but orders that a valid limitation of liability was in effect. Therefore, liability was limited to $100,000 and judgment shall be entered in favor of the plaintiff and against the defendant in the amount of $100,000.

**AND IT IS SO ORDERED**.

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge

Florence, S.C.
May 20, 2008